IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 19-00214-02-CR-W-BP |
| ) | |
| BRYAN C. KIRKENDOLL II, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant's Motion to Suppress Evidence After Unlawful Arrest (Doc. #53) and Defendant's Motion to Suppress Evidence of Illegal Snap Warrant (Doc. #55). For the reasons set forth below, it is recommended that these motions be denied.

I. INTRODUCTION

On June 14, 2019, a Criminal Complaint was filed against defendants Viktor Chernetskiy and Bryan C. Kirkendoll II. On June 26, 2019, the Grand Jury returned a five-count Indictment against defendants Chernetskiy and Kirkendoll. On June 9, 2020, the Grand Jury returned an eleven-count Superseding Indictment against defendants Chernetskiy and Kirkendoll.[1] Defendant Kirkendoll is charged with Conspiracy to Commit Interstate Transportation of Stolen Property (Count One), Interstate Transportation of Stolen Property (Counts Two, Three, Four, Five, and Six), Witness Tampering (Counts Seven, Nine, and Eleven), and Transmitting Threats

---

[1] Defendant Chernetskiy entered a guilty plea on June 17, 2020.

in Interstate Commerce (Counts Eight and Ten).

On October 14, 2020, an evidentiary hearing was held on defendant Kirkendoll's motions to suppress. Defendant Kirkendoll was represented by appointed counsel, Keith O'Connor.[2] The Government was represented by Assistant United States Attorney Rudolph R. Rhodes, IV. The Government called Special Agents Austin McKune and Amy Ramsey of the Federal Bureau of Investigation ("FBI") and Master Sergeant Bradley Ream of the Missouri State Highway Patrol as witnesses. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. In March of 2019, FBI Special Agent Austin McKune received a call from the Missouri State Highway Patrol seeking assistance for multiple cell phone store burglaries that they had been tracking throughout the region. (Tr. at 7, 50.) The Missouri State Highway Patrol was looking for assistance due to the multi-state, multi-jurisdictional nature of the burglaries. (Tr. at 7.) Special Agent McKune testified that he worked with his partner, Special Agent Amy Ramsey, and Master Sergeant Bradley Ream of the Missouri State Highway Patrol. (Tr. at 13.) The officers began the investigation by gathering information in police reports from several states regarding burglaries that appeared to have the same methods of operation, including photographs and videos from the stores. (Tr. at 7.) The officers compared both the methods and the photographs of the individuals who were involved in the burglaries. (Tr. at 7-8.) Master Sergeant Ream testified that it appeared that one of the individuals involved was a white male and the other was a black male. (Tr. at 51.)

2. The officers had information that a truck registered to Viktor Chernetskiy was involved in burglaries in Salisbury and Macon, Missouri, so the officers believed it likely that Chernetskiy was one of the individuals involved in the burglaries. (Tr. at 8, 50.) The officers did some toll record analysis on Chernetskiy's cell phone and later applied for and received a court-authorized GPS tracking order for the phone. (Tr. at 8.)

---

[2]On December 15, 2020, Dione C. Greene was appointed to represent defendant Kirkendoll, replacing Mr. O'Connor.

3. In the evening of June 13, 2019, Special Agent McKune received an update on the location of Viktor Chernetskiy's phone indicating that it was moving southbound on I-35 heading toward Wichita in the vicinity of Lebo, Kansas. (Tr. at 8.) At that time, Special Agent McKune looked at a couple of the previous location fixes and saw that the phone had been in the vicinity of Chernetskiy's residence at 11008 Grandview, Kansas City, Missouri, at approximately 5:06 p.m. (Tr. at 8.) Special Agent McKune testified that he had a pole camera surveilling Chernetskiy's residence. (Tr. at 8, 10.) Special Agent McKune was able to go back and look at the pole camera footage. (Tr. at 8-9.) Special Agent McKune testified that he saw a vehicle pull into Chernetskiy's driveway at approximately 5:10 p.m. (Tr. at 9.) An adult male wearing gray sweatpants and a black-bodied shirt with a white logo in the middle with lighter gray sleeves and a hoodie stepped out of the vehicle. (Tr. at 9.) At approximately 5:33 p.m., this male and Chernetskiy departed the residence in Chernetskiy's silver Charger. (Tr. at 8-10.)

4. Special Agent McKune testified that after viewing the pole camera footage, he continued to monitor the location of the phone moving southbound on I-35. (Tr. at 12.) Special Agent McKune relayed this information to Special Agent Ramsey. (Tr. at 57.) Master Sergeant Ream testified that he was also getting updates for the GPS locations on his phone. (Tr. at 51.) Special Agent McKune testified that he and the other officers agreed that it was too late for them to catch up and conduct a physical surveillance because the phone and the car were already past Emporia, Kansas. (Tr. at 12-13.) Instead, Special Agent McKune and Master Sergeant Ream monitored the location of the phone throughout the night and updated Special Agent Ramsey on the pings. (Tr. at 13, 52, 57.) Master Sergeant Ream contacted the Kansas State Patrol to obtain license plate reader information for the license plate of the silver Charger and confirmed that it was southbound on I-35 at approximately 7:00 p.m. (Tr. at 13, 51-52.) Special Agent McKune testified that he tracked the phone as it went south toward Oklahoma. (Tr. at 13.)

5. Special Agent McKune testified that he received updates to location approximately every fifteen to thirty minutes. (Tr. at 13.) At around 3:07 a.m., Special Agent McKune received an update showing that the phone was in the vicinity of Enid, Oklahoma, and that it appeared to be stationary for a few minutes at least. (Tr. at 13-14.) Approximately thirty minutes later, Special Agent McKune received a location update of the phone being in Pond Creek, Oklahoma. (Tr. at 14.)

6. Master Sergeant Ream contacted the Enid Police Department to inquire if they had seen any burglary activities concerning cellular telephone stores in that area. (Tr. at 14, 52-53.) Master Sergeant Ream learned that a Pioneer Cellular telephone store had been burglarized by two individuals in Enid, Oklahoma. (Tr. at 14, 53.) While Master Sergeant Ream was on the phone with the Enid Police Department, they heard radio traffic that there was another burglary at a Pioneer Cellular

3

telephone store in Pond Creek and connected Ream to the Pond Creek Police Department. (Tr. at 14, 53.) The Enid Police Department was able to obtain photographs from surveillance cameras within the Enid Pioneer Cellular store and provided a description of the two individuals and their vehicle, a silver Dodge passenger vehicle, to Master Sergeant Ream. (Tr. at 14-15, 32-33, 53-54.) Based on his review of photographs and videos gathered in the investigation of other cell phone store burglaries, Master Sergeant Ream was familiar with the appearance of the individuals who had been involved in the burglaries of other cell phone stores. (Tr. at 15.) Master Sergeant Ream reported to Special Agent McKune that he believed that the individuals involved in the Enid, Oklahoma burglary were the same individuals that the officers had seen in photos relating to the other burglaries. (Tr. at 15, 34, 55.)

7. Master Sergeant Ream re-contacted the Kansas State Patrol to obtain license plate reader information for the license plate of the silver Charger. (Tr. at 52.) At approximately 4:00 a.m., the license plate reader showed the silver Charger driving northbound on I-35, just north of the Oklahoma-Kansas state line. (Tr. at 15, 52.) Special Agents McKune and Ramsey drove separately toward Emporia, Kansas to initiate surveillance. (Tr. at 15, 16, 58.) The officers were provided with the following description of the suspects who had burglarized the Enid, Oklahoma store: a white male wearing a gray sweatsuit with a dark hat with a gray bill that was very flattened with a shiny sticker right in the middle of the top of it and a hood; and a slender black male wearing gray pants[3] and a dark bodied sweatshirt with lighter gray sleeves and a hood. (Tr. at 15-16.)

8. Special Agent McKune testified that at approximately 6:30 a.m., he spotted the silver Charger driving northbound on I-35 at County Road U, which is several miles north of Emporia, Kansas. (Tr. at 16.) Special Agent McKune testified that he followed the vehicle at a distance until Special Agent Ramsey could join him and then they both conducted surveillance of the vehicle. (Tr. at 16.) Special Agent Ramsey testified that at approximately 7:04 a.m., the vehicle pulled into a Love's Travel Stop in Ottawa, Kansas. (Tr. at 58.) Special Agent Ramsey observed a black male exit the Love's Travel Stop and enter the passenger door of the silver Charger. (Tr. at 58.) Special Agent Ramsey advised Special Agent McKune over the radio that this black male was wearing gray pants and a black sweatshirt with a white Nike swish on it. (Tr. at 58-59.) The silver Charger then continued north on I-35 in Kansas. (Tr. at 59.)

9. Special Agent McKune testified that he, along with Master Sergeant Ream, directed Missouri State Highway Patrol troopers to make a vehicle stop of the silver Charger when it entered the state of Missouri. (Tr. at 34, 55.) Special Agent McKune

---

[3]In an Enid Police Department Offense/Incident Report, the pants are described as khaki. (Tr. at 38-39.)

4

testified that the vehicle was stopped due to the belief that it was involved in transporting stolen cell phones from Oklahoma through Kansas to Missouri. (Tr. at 34.) When the vehicle was stopped, the driver was identified as Viktor Chernetskiy. (Tr. at 17.) The passenger of the vehicle was identified as Bryan Kirkendoll. (Tr. at 17.) Special Agent McKune testified that Chernetskiy and Kirkendoll were handcuffed and detained, but not arrested, at that time. (Tr. at 35-36.)

10. Special Agent McKune testified that the descriptions the officers received of the individuals involved in the Oklahoma burglaries matched the individuals who were the occupants of the silver Charger. (Tr. at 17.) Special Agent McKune further testified that although he did not know Bryan Kirkendoll's name prior to this stop, in the course of the investigation, he had seen multiple videos and photographs of somebody fitting his exact description and frequently in the very same clothing. (Tr. at 35.) Special Agent McKune spoke to both Bryan Kirkendoll and Viktor Chernetskiy at the stop where they each indicated that they were willing to speak with McKune. (Tr. at 17.)

11. Bryan Kirkendoll and Viktor Chernetskiy were transported separately to the FBI Office in Kansas City. (Tr. at 17.) At the FBI Office, Kirkendoll and Chernetskiy each declined to be interviewed without an attorney. (Tr. at 17.) Special Agent McKune took photographs of each of them after they declined to be interviewed. (Tr. at 17-18.) Government's Exhibit 5 is the photograph of Viktor Chernetskiy. (Tr. at 18.) In the photograph, Chernetskiy is wearing a gray sweatsuit with a hood and a dark hat that had a shiny sticker in the middle of the bill. (Gov. Exh. 5.) Government's Exhibit 6 is the photograph of Bryan Kirkendoll. (Tr. at 18.) In the photograph, Kirdendoll is wearing gray pants and a dark-bodied sweatshirt with a white Nike swoosh on the front with lighter gray sleeves and a hood. (Tr. at 18.)

12. Special Agent McKune obtained a Criminal Complaint and arrest warrants for Viktor Chernetskiy and Bryan Kirkendoll. (Tr. at 18, 36.) While transporting Bryan Kirkendoll to the U.S. Marshals, $56.00 was taken from Kirkendoll's person. (Tr. at 19.) That money has been returned to Kirkendoll. (Tr. at 19.)

13. Special Agent McKune obtained a search warrant for the vehicle. (Tr. at 19.) A search of the vehicle revealed approximately 156 cell phones in original new packaging inside trash bags in the trunk. (Tr. at 19.) Another trash bag in the back seat of the vehicle contained 27 cell phones. (Tr. at 19.)

14. On September 20, 2019, Special Agents McKune and Ramsey interviewed a person who identified herself as Brionna Willis. (Tr. at 19, 60-61.) Willis had contacted the United States Attorney's Office for the Western District of Missouri and said that she wanted to speak with investigators regarding Bryan Kirkendoll. (Tr. at 19, 61.) Willis told the officers that she was an ex-girlfriend of Kirkendoll and

that she had dated Kirkendoll from January 2019 to the end of August 2019. (Tr. at 20, 61.) Willis stated that she had been on the phone with Kirkendoll at approximately 4:00 a.m. on the morning that he was arrested and that Kirkendoll had told her that he thought he was being followed by the police. (Tr. at 20.) Willis also stated that she was on the phone with Kirkendoll at the time he was pulled over for the traffic stop. (Tr. at 20.) Willis provided the officers with Kirkendoll's telephone number. (Tr. at 20.) Willis told the officers:

> . . . that approximately four times throughout the time they were dating he would depart the Kansas City area sometime around midday in the afternoon and come back usually in the early morning hours of the following night. She said she wasn't sure where he was going with his friend "Lucci" who she described with the same characteristics as Viktor Chernetskiy. But they spent most of the time driving and spent very little time at the destination.

(Tr. at 21.) Willis talked about Kirkendoll frequently having unexplained large amounts of cash. (Tr. at 21.) Willis told the officers that Kirkendoll had been violent with her on multiple occasions in June and July of 2019. (Tr. at 46.) Willis told the officers that she was afraid of Kirkendoll. (Tr. at 63.)

15. During the interview of Brionna Willis, Bryan Kirkendoll's Snapchat account came up. (Tr. at 22, 61.) Special Agent Ramsey testified, "We did not ask her to access the Snapchat account. It was already accessed." (Tr. at 71.) Special Agent McKune testified:

> She pulled up her phone and said that she had access to Mr. Kirkendoll's Snapchat account from when they were dating. And she scrolled through a number of photos and videos containing things like boxes of what appeared to be new . . . cell phones that appeared to be in their original new boxes and packaging, large amounts of cash and firearms, including some with her in them as well.

(Tr. at 22.) The officers videotaped Willis scrolling through her phone to document the photos and videos that Willis was showing them. (Tr. at 23, 62.) Special Agent Ramsey testified that they saw photos of Willis with Kirkendoll so the officers did not question that Willis knew Kirkendoll. (Tr. at 62.) Special Agents McKune and Ramsey each testified that they had no reason to believe that Willis had illegally accessed Kirkendoll's Snapchat account. (Tr. at 23, 63.) Special Agent McKune testified that he has "experienced numerous people having access to boyfriend's, girlfriend's, wives', et cetera, social media in the past." (Tr. at 41.) Willis provided the Snapchat account username and password to the officers. (Tr. at 23.) Special Agent McKune testified that he did not access the

6

Snapchat account himself, even having that information, without a search warrant. (Tr. at 23.)

16. Special Agent McKune testified that he does not believe that he asked Brionna Willis whether she had permission to access the account. (Tr. at 45.) Special Agent Ramsey testified that she did not ask Willis whether she had permission to access the account. (Tr. at 68.) Special Agent Ramsey testified, "The onus of a social media account security is on the owner. If a password is provided to somebody and the owner does not change that password, it is not illegal." (Tr. at 68.)

17. On October 16, 2019, Special Agent Ramsey applied for and obtained a search warrant for Bryan Kirkendoll's Snapchat account.[4] (Tr. at 23, 66; Gov. Exh. 7.) The Affidavit in Support [of] an Application for a Search Warrant stated in part:

> 17. Willis had access to Kirkendoll's Snapchat account on her own cell phone and showed Agents McKune and Ramsey numerous photos and videos saved by Kirkendoll depicting what appeared to be stacks of new cell phones in their original packaging, large amounts of cash, and numerous firearms.

(Gov. Exh. 7 at 6.) The Affidavit then provided a summary of the photographs and videos, with dates ranging from December 20, 2018, to May 25, 2019. (Gov. Exh. 7 at 6-7.)

18. In early April 2020, Special Agents McKune and Ramsey learned that the true name of the person they knew as Brionna Willis is Taressa Swygert. (Tr. at 23-24, 63.) Special Agent McKune testified that at the time of the interview, he had no reason to believe that Willis was not who she said she was. (Tr. at 46.) Special Agent Ramsey testified that given the information Willis provided which was corroborated by what the officers already knew from their investigation, they had no reason to disbelieve her. (Tr. at 61-62.) When the officers tried to index Willis's information into their systems, they were not able to verify information for her. (Tr. at 46-47.) Special Agent McKune testified that there are frequently times when they cannot identify individuals. (Tr. at 47.) Special Agent McKune testified that it is not uncommon for victims to provide a false name. (Tr. at 46.)

---

[4]The undersigned was presented with the Application for a Search Warrant and signed this Search and Seizure Warrant. (Gov. Exh. 7.)

7

III.  DISCUSSION

Defendant Kirkendoll seeks to suppress "any evidence seized from Mr. Kirkendoll's person incident to his arrest on June 14, 2019, including actual physical evidence, like clothing or athletic shoes, as well as photographic evidence and testimonial evidence regarding such items" (Defendant's Motion to Suppress Evidence After Unlawful Arrest at 1; Doc. #53) and "any evidence seized from Mr. Kirkendoll's personal Snap social media account" (Defendant's Motion to Suppress Evidence of Illegal Snap Warrant at 1; Doc. #55).

A. Defendant's Motion to Suppress Evidence After Unlawful Arrest (Doc. #53)

Defendant Kirkendoll argues that he was arrested without probable cause, making his warrantless arrest unlawful, and that evidence discovered pursuant to a search incident to an unlawful arrest should be suppressed. (Defendant's Suggestions in Support of Motion to Suppress Evidence After Unlawful Arrest at 3; Doc. #54).

While Special Agent McKune testified that defendant Kirkendoll was detained, but not arrested, after the vehicle stop (Fact No. 9), for purposes of the Court's analysis, the Court finds that defendant Kirkendoll was subject to a warrantless arrest. *See United States v. Elmquist*, No. 07-00245-01-CR-W-ODS, 2008 WL 3895971, at *13 (W.D. Mo. Aug. 18, 2008) ("Although, [the detective] described the confrontation with Elmquist as an effort to effectuate a '24-hour investigative hold,' [where Elmquist was probably neither free to leave nor free to ignore the request that he come in for police questioning,] for purposes of constitutionality, it was a warrantless arrest.")

A warrantless arrest by law enforcement officers is reasonable where there is probable cause to believe that someone has committed a crime. *See United States v. Winarske*, 715 F.3d

8

1063, 1066 (8th Cir. 2013), *cert. denied*, 572 U.S. 1003 (2014). The *Winarske* court stated:

> Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest. *United States v. Webster*, 625 F.3d 439, 442 (8th Cir. 2010). Instead, the mere "probability or substantial chance of criminal activity, rather than an actual showing of criminal activity," is all that is required. *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005). In making a probable cause determination, "[l]aw enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Henderson*, 613 F.3d 1177, 1181 (8th Cir. 2010) (internal quotation omitted).

715 F.3d at 1067.

In the instant case, officers had been investigating multiple cell phone store burglaries throughout the region, comparing both the methods and the photographs of the individuals who were involved in the burglaries. (Fact No. 1.) Officers believed it likely that Viktor Chernetskiy was one of the individuals involved in the burglaries because the officers had information that a truck registered to Chernetskiy was involved in two of the burglaries. (Fact No. 2.) On the evening of June 13, 2019, officers tracked Chernetskiy's cell phone leaving his residence in Kansas City, Missouri, and travelling southbound on I-35. (Fact Nos. 3 and 4.) Looking at video footage from Chernetskiy's residence at the time Chernetskiy's cell phone left the residence that evening, officers observed a second male depart the residence with Chernetskiy in Chernetskiy's silver Charger. (Fact No. 3.) Officers continued to track the cell phone and confirmed through license plate reader information that Chernetskiy's silver Charger was heading south on I-35 toward Oklahoma. (Fact No. 4.) The GPS updates showed the cell phone to be stationary for a time at Enid, Oklahoma, and then at Pond Creek, Oklahoma. (Fact No. 5.) Master Sergeant Ream contacted the Enid Police Department to inquire if they had seen any burglary activities concerning any cellular telephone stores in the area and learned that one store in Enid and another store in

9

Pond Creek had just been burglarized. (Fact No. 6.) The Enid Police Department obtained photographs from surveillance cameras within the Enid store and provided a description of the two individuals and their vehicle, a silver Dodge passenger vehicle. (*Id.*) Based on the description of the two individuals, Master Sergeant Ream believed that the individuals involved in the Enid, Oklahoma burglary were the same individuals that the officers had seen in photos relating to other burglaries. (*Id.*) Officers obtained license plate reader information that at approximately 4:00 a.m., Chernetskiy's silver Charger was heading northbound on I-35, just north of the Oklahoma-Kansas state line. (Fact No. 7.) The silver Charger was stopped after it crossed into the state of Missouri. (Fact No. 9.) The driver was identified as Viktor Chernetskiy and the passenger was identified as Bryan Kirkendoll. (*Id.*) Chernetskiy and Kirkendoll matched the descriptions provided by the Enid Police Department, but for the description of Kirkendoll's pants as khaki rather than gray (a difference that the Court does not consider significant given the Court's experience with the quality of security camera footage). (Fact Nos. 7 and 11.)

The Court finds that these facts would lead a reasonable person to believe that a crime had been committed and that defendants Kirkendoll and Chernetskiy had committed it. Therefore, the Court concludes that law enforcement officers had probable cause to effectuate a warrantless arrest of defendants Kirkendoll and Chernetskiy. The search of defendant Kirkendoll's person was valid as a search incident to a lawful arrest. Defendant's Motion to Suppress Evidence After Unlawful Arrest (Doc. #53) must be denied.

  B.  <u>Defendant's Motion to Suppress Evidence of Illegal Snap Warrant (Doc. #55)</u>

Defendant Kirkendoll argues that the FBI used information (saved photographs in Kirkendoll's Snapchat account and Kirkendoll's username and password) provided by "Brionna

Willis" to obtain and serve a search warrant on Snap, the parent company of Snapchat. (Defendant's Suggestions in Support of Motion to Suppress Evidence of Illegal Snap Warrant at 1-2; Doc. #56.) Defendant Kirkendoll contends that the information provided by Willis was illegally obtained as Willis was not authorized to access his Snapchat account and, therefore, any evidence obtained pursuant to the warrant should be suppressed.[5] (*Id.* at 2.)

The following evidence pertinent to this issue was presented at the suppression hearing. A person who identified herself as Brionna Willis contacted the United States Attorney's Office for the Western District of Missouri and said that she wanted to speak with investigators regarding Bryan Kirkendoll. (Fact No. 14.) Special Agents McKune and Ramsey interviewed Willis on September 20, 2019. (*Id.*) During the interview, Willis pulled up Kirkendoll's Snapchat account on her phone and scrolled through a number of photos and videos showing boxes of cell phones in their original packaging, large amounts of cash, and firearms. (Fact No. 15.) Willis told the officers that she had access to Kirkendoll's Snapchat account from when they were dating. (*Id.*) Some of the photos in Kirkendoll's Snapchat account showed Willis with Kirkendoll. (*Id.*) The officers had not asked Willis to access the Snapchat account. (*Id.*)

"It is well-settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit government use of that information." *United States v. Jacobsen*, 466 U.S. 109, 117 (1984). In other words, when defendant Kirkendoll provided access

---

[5]The fact that the undersigned had signed the subject search warrant was discussed with counsel at the suppression hearing. (Tr. at 2-4.) Counsel agreed that the hearing should proceed before the undersigned as the motion challenged whether the information presented in the Application for a Search Warrant was illegally obtained as opposed to whether probable cause existed to issue the warrant. (Tr. at 3-4.)

11

to private information (the photos and videos in his Snapchat account) to his girlfriend, he assumed the risk that his girlfriend would reveal that information to the authorities, and the Fourth Amendment does not prohibit government use of that information.

While defendant Kirkendoll argues in his motion that the information provided by Brionna Willis was illegally obtained as Willis was not authorized to access his Snapchat account, no evidence was presented at the hearing to support this argument. Instead, Brionna Willis provided Kirkendoll's Snapchat account username and password to the officers. (Fact No. 15.) Special Agents McKune and Ramsey each testified that they had no reason to believe that Willis had illegally accessed Kirkendoll's Snapchat account. (*Id.*)

However, even if Brionna Willis was not authorized to access defendant Kirkendoll's Snapchat account, there was no Fourth Amendment violation. In *United States v. Goodale*, 738 F.3d 917, 921 (8th Cir. 2013), *cert. denied*, 573 U.S. 937 (2014), the Court discussed a similar situation where a private party, who was not authorized to possess the defendant's laptop, showed information contained within the laptop to authorities. The Court explained:

> Goodale argues that his laptop was seized and searched in violation of the Fourth Amendment. Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 481 (1971). At issue here is the private search exception. The Fourth Amendment "does not extend to private searches that are neither instigated by nor performed on behalf of a governmental entity." *United States v. Starr*, 533 F.3d 985, 994 (8th Cir. 2008). If the government views items found during a private search, the "legality of later government intrusions 'must be tested by the degree to which they exceeded the scope of the private search.'" *Id., quoting United States v. Miller*, 152 F.3d 813, 815 (8th Cir. 1998).
>
> The private search exception applies here. After discovering a history of teen pornography sites, M.R. and his mother took Goodale's laptop to the police station where M.R. showed officers the laptop's web history. This search was neither instigated by nor performed on behalf of the police. *See id.* at 994. During

12

M.R.'s demonstration, an officer moved and touched the laptop for about 17 seconds. No evidence suggests that the officer's viewing went further than M.R.'s search. *See id.* ("When the government re-examines materials following a private search, the government may intrude on an individual's privacy expectations without violating the Fourth Amendment, provided the government intrusion goes no further than the private search.").

Goodale contends that the private search exception is inapplicable because he did not consent to M.R.'s possession or transportation of the laptop. He further believes the exception does not apply when the search and seizure results from trespass or theft by a private party. These arguments are meritless. The private search exception applies "to a search or seizure, *even an unreasonable one,* effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (emphasis added), *citing Walter v. United States*, 447 U.S. 649, 662 (1980). *See also United States v. Malbrough*, 922 F.2d 458, 462-63 (8th Cir. 1990) (upholding a search by a private citizen who trespassed on another's property and viewed marijuana).

738 F.3d at 921.

In the instant case, no evidence has been presented to suggest that Brionna Willis's search of defendant Kirkendoll's Snapchat account was either instigated by or performed on behalf of the officers. Rather, Willis requested a meeting with the officers and accessed the Snapchat account of her own accord during that meeting. (Fact No. 15.) Special Agent McKune testified that he did not access the Snapchat account himself. (*Id.*) The Court finds that the private search exception applies here. Defendant's Motion to Suppress Evidence of Illegal Snap Warrant (Doc. #55) must be denied.

IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion to Suppress Evidence After Unlawful Arrest (Doc. #53). It is further

13

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion to Suppress Evidence of Illegal Snap Warrant (Doc. #55).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

 */s/ Lajuana M. Counts*
Lajuana M. Counts
United States Magistrate Judge