# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 19-00214-02-CR-W-BP |
| | ) | |
| BRYAN C. KIRKENDOLL II, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING DEFENDANT'S MOTIONS TO SUPPRESS

Pending are two motions to suppress evidence by Defendant Bryan C. Kirkendoll II. (Docs. 53, 55.) On *de novo* review, the Court adopts Judge Counts's Report and Recommendation. Defendant's motions to suppress are **DENIED**.

## I. BACKGROUND

The Court adopts the Report in its entirety, including its recommended findings of fact. In summary, FBI Special Agents Austin McKune and Amy Ramsey, along with Missouri State Highway Patrol Master Sergeant Bradley Ream, were investigating a series of cell phone store burglaries. The officers found information suggesting that a vehicle registered to co-Defendant Viktor Chernetskiy was involved in some of the burglaries. They then applied for and obtained a GPS tracking order for Chernetskiy's cell phone, and placed a surveillance camera outside of Chernetskiy's residence.

On June 13, 2019, the officers saw from the surveillance camera that an adult male wearing a hoodie, a black long-sleeve shirt, and gray sweatpants entered Chernetskiy's vehicle along with Chernetskiy, and the pair drove off together. The officers then used the GPS tracker to ascertain that Chernestkiy drove the vehicle to Enid, Oklahoma, and that after arriving in that city,

Chernetskiy's phone appeared to be stationary for a period of time. A half hour later, the officers learned that the phone had left Enid.

The officers contacted the Enid Police Department to ask whether any burglaries had occurred during the period in which Chernetskiy and his companion were in town. The officers learned that a cell phone store in Enid had been burglarized, and, after consulting security camera footage from the store, found that the perpetrators were similar in appearance to Chernetskiy and the man from the surveillance video taken outside Chernetskiy's home.

The officers then contacted the Kansas State Patrol to ascertain whether Chernetskiy's vehicle was in Kansas, and found that it had crossed the Oklahoma-Kansas state line. Special Agents McKune and Ramesy drove to Emporia, Kansas, to try to intercept the vehicle. When the vehicle stopped at a gas station, the agents ascertained that its occupants matched the security video of the individuals who had burglarized the Enid phone store.

Special Agent McKune and Master Sergeant Ream instructed Missouri State Highway Patrol officers to stop the vehicle once it entered Missouri, believing that the vehicle was being used to transport stolen cell phones across state lines. Missouri State Highway Patrol officers stopped the vehicle, and handcuffed and detained its occupants: Chernetskiy and Defendant Bryan Kirkendoll. Although Special Agent McKune did not know Defendant's name before the stop occurred, Defendant's appearance matched multiple photos and videos McKune had seen in the course of investigating the burglaries. Kirkendoll was also wearing clothing that matched the clothing of the individual whom the officers had seen enter Chernetskiy's vehicle in the footage from the surveillance camera outside Chernetskiy's home. Special Agent McKune obtained arrest warrants for Defendant and Chernetskiy, as well as a search warrant for Chernetskiy's vehicle. Officers found 183 cell phones in new packaging in Chernetskiy's vehicle.

On September 20, 2019, Special Agents McKune and Ramsey interviewed a woman who called herself Brionna Willis, but unbeknownst to the agents at the time, her real name was Taressa Swygert. Swygert had apparently reached out to the United States Attorney's Office for the Western District of Missouri offering information about Defendant. Swygert told the agents that she had dated Kirkendoll for a period of time, and provided information to verify their relationship, including Kirkendoll's cell phone number. She then told the agents that she was afraid of Kirkendoll.

During the interview, Swygert pulled out her cell phone and accessed what she said was Defendant's Snapchat account. The agents did not ask Swygert to access the account, nor did they believe that her access to the account was unauthorized, since, in their experience, romantic partners often share access to social media accounts. After Swygert opened the account, the agents filmed her scrolling through its contents; the Snapchat account included photos and videos depicting cash, firearms, and unopened cell phone boxes. Later, on October 16, Special Agent Ramsey obtained a search warrant to access Defendant's Snapchat account, based in part on an affidavit by Ramsey describing what he saw of the contents of Kirkendoll's account on Swygert's phone.

On June 26, 2019, Defendant was indicted on several counts, including one for conspiracy to commit interstate transportation of stolen property under 18 U.S.C. § 371. (Doc. 13.) Defendant filed two motions to suppress evidence. The first, (Doc. 53), argues that Defendant's arrest was unlawful, and that any evidence seized incident to his arrest should be suppressed. The second, (Doc. 55), argues that the warrant to access Defendant's Snapchat account was illegally obtained, and that any evidence taken from that account should be suppressed. After reviewing the evidence

3

and holding an evidentiary hearing, Judge Counts recommended denying both motions. Defendant has now filed *pro se* objections to the Report and Recommendations on various grounds.

The Court has reviewed the briefing and other materials in this case. After considering the matter *de novo*, the Court adopts Judge Counts's Report and Recommendations, and **DENIES** Defendant's motions to suppress.

## II. DISCUSSION

The Court adopts Judge Counts's Recommendation; this Discussion is meant to confirm, rather than supplant, her legal analysis. Defendant offers a number of objections to the Recommendation, many of which he did not raise in his motions to suppress. The Court addresses each of these objections in turn.

First, Defendant objects to the use of the GPS tracking device, arguing that he is outside the scope of the order authorizing the tracking device because there was nothing in the warrant connecting him to Chernetskiy's alleged illegal activities. (Doc. 93, pp. 4–5.) This argument was not raised in either of Defendant's motions to suppress, and regardless, lacks merit. "[L]aw enforcement needs a warrant based on probable cause to access cell phone location records." *United States v. Thompson*, 976 F.3d 815, 822 (8th Cir. 2020). Probable cause exists for GPS tracking when there is a "fair probability" that "location data . . . would lead to evidence" of criminal behavior. *United States v. Petruk*, 929 F.3d 952, 959 (8th Cir. 2019) (citations omitted). Defendant does not contest that there was a fair probability that tracking Chernetskiy's phone would lead to evidence of criminal activity, meaning that probable cause supported the GPS tracking order.

Moreover, "Fourth Amendment rights are personal rights that may not be asserted vicariously," and so "a defendant who fails to prove a sufficiently close connection to the relevant

4

[] objects searched [] has no standing to claim that they were searched . . . illegally." *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) (cleaned up; citations omitted). Defendant does not explain how he had a close connection with, or reasonable expectation of privacy in, Chernetskiy's phone; thus, he lacks standing to challenge the order authorizing GPS tracking for the phone.

Second, Defendant argues that there was no probable cause to stop Chernetskiy's car and arrest Chernetskiy and himself. (Doc. 94, p. 5.) The agents characterized Defendant's initial contact with law enforcement as a "detention" rather than an "arrest," but Judge Counts found that the officers actually conducted a warrantless arrest on Defendant when he was found in Chernetskiy's car, and that there was probable cause to support the arrest. (Doc. 92, p. 8.) The Court agrees with this analysis.

To arrest a person without a warrant, an officer must be aware of circumstances that demonstrate a "probability or substantial chance" that the person was involved in "criminal activity"; the officer is permitted "substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013), *cert. denied*, 572 U.S. 1003 (2014) (citations and quotations omitted). Here, officers observed a person dressed in similar clothing and otherwise matching the description of Defendant depart in Chernetskiy's car the evening before Defendant was arrested. Defendant also matched photographs of an individual who had been involved in burglaries with Chernetskiy prior to the arrest. The officers used a GPS tracker to trace Chernetskiy's movements; they found that Chernetskiy drove to Enid, Oklahoma, and that while he was there, a cell phone store was burglarized in a similar fashion to the other burglaries in which Chernetskiy was a suspect. The officers obtained a description of one of the burglars which matched Defendant. On Chernetskiy's

5

return trip, the officers tracked his car using the license plate number, and then stopped the car once it arrived in Missouri. Chernetskiy and Defendant generally matched the descriptions provided by the Enid police department, along with other information the officers obtained about the perpetrators of similar cell phone store burglaries. This is enough to establish a "probability or substantial chance" that Defendant was involved in "criminal activity."

Defendant offers a few reasons why probable cause did not exist to arrest him, but these arguments are unavailing. Defendant asserts that nine hours elapsed between Chernetskiy's departure and the Enid burglary, but the drive between Chernetskiy's home and Enid is only four hours, so "there had to be some form of stop(s) in between" Chernetskiy's departure and the burglary. (Doc. 93, p. 6.) But probable cause was based on the similarity between Defendant's appearance and clothing and the individual spotted entering Chernetskiy's vehicle, so this argument is irrelevant. Defendant also takes issue with small discrepancies in the ways in which his clothing was described at various times; for instance, Special Agent McKune described Defendant as "an adult wearing gray pants and dark colored shirt" on an affidavit, and "an adult male wearing gray sweatpants, and a black-bodied shirt with a white logo in the middle along with lighter grey sleeves and a hoodie" at the suppression hearing. (Doc. 93, p. 5.)[1] The Court agrees with Judge Counts that the descriptions of (1) the individual who entered Chernetskiy's car and (2) the individual who accompanied Chernetskiy in burglarizing the phone store in Enid are

---

[1] Similarly, the Court is unconvinced that the fact that Enid police officers described the car involved in the burglary as "dark colored" and "possibly black," even though Chernetskiy's car is "silver," casts doubt on the reliability of the Enid police department's information on the suspected burglars; given that the alleged burglary took place in the early hours of the morning, it would likely have been difficult to ascertain the precise color of a car based on security camera footage.

6

generally consistent with Defendant's appearance when he was arrested, and any slight differences do not cast doubt on the validity of Defendant's arrest.[2]

Third and finally, Defendant contends that the warrant to investigate Defendant's Snapchat account was not supported by probable cause, because Swygert (1) used a false name when she introduced Special Agents McKune and Ramsey to Defendant's Snapchat account, and (2) lacked authority to access the account. (Doc. 93, pp. 8–9.) The Court agrees with Judge Counts that these arguments do not undermine the validity of the warrant. "[W]hen an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit government use of that information." *United States v. Jacobsen*, 466 U.S. 109, 117 (1984).

Defendant claims that he "orally through Counsel proffered that Ms. Swygert did not have [D]efendant[']s permission to access his Snapchat account." (Doc. 93, p. 9.) But the relevant question is not whether Swygert actually had authority to access and share information from Defendant's Snapchat account; the relevant question is whether the agents reasonably believed that she did. *E.g., United States v. Almeida-Perez*, 549 F.3d 1162, 1169–70 (8th Cir. 2008). Here, it is undisputed that Swygert had access to Defendant's Snapchat account, and also knew Defendant's Snapchat login information, which tends to suggest that she was authorized to access the account; the agents testified that in their experience, it is common for people involved in a relationship to share login information to social media accounts. And as Judge Counts pointed out, there is simply no evidence (aside from Defendant's self-serving assertion) that would have suggested to the agents that Swygert's access to the account was unauthorized. Based on the

---

[2] Defendant also complains that in Special Agent McKune's testimony at the suppression hearing, McKune did not identify which Enid police officer he contacted. Because there appears to be no reason to doubt the reliability of the information communicated by the Enid police department, this omission is not legally relevant.

7

information in his possession, Special Agent McKune could reasonably conclude that Swygert had common authority over the Snapchat account and could show him its contents. And after seeing the information Swygert volunteered from Defendant's Snapchat account—which included pictures of cash, firearms, new cell phones, and Swygert herself—Special Agent McKune had probable cause to request a warrant to search the account, since he had a reason to believe that the pictures on the account would furnish evidence of Defendant's criminal activity.

### III. CONCLUSION

For these reasons, the Court adopts the Report and Recommendation of Judge Counts and **DENIES** Defendant's motions to suppress. (Docs. 53, 55.)

**IT IS SO ORDERED.**

DATE: February 19, 2021

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
UNITED STATES DISTRICT COURT